**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

DEQUIN MASON

CASE NO. 20-CV-11298

     *Plaintiff,*

HON. ROBERT H. CLELAND
DISTRICT JUDGE

*v.*

COMMISSIONER OF SOCIAL
SECURITY,

HON. PATRICIA T. MORRIS
MAGISTRATE JUDGE

     *Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 12, 14)

### I.    RECOMMENDATION

Plaintiff Dequin Mason challenges the Commissioner of Social Security regarding a final decision denying his claim for Title II Disability Insurance Benefits ("DIB"). The case was referred to the undersigned for review. (ECF No. 3); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 12), **GRANTING** the Commissioner's motion, (ECF No. 14), and affirming the decision.

### II.    REPORT

#### A. Introduction and Procedural History

Plaintiff's application for DIB was completed on June 8, 2018. (ECF No. 10, PageID.173.) He alleged he became disabled on September 28, 2017. (*Id.*) The

Commissioner denied the claim on August 29, 2018. (*Id*. at PageID.112.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on March 14, 2019. (*Id*. at PageID.122; *id*. at PageID.71.) The ALJ issued a decision on May 14, 2019, finding that Plaintiff was not disabled. (*Id*. at PageID.66.) The Appeals Council denied review on March 27, 2020. (*Id*. at PageID.41.) Plaintiff sought judicial review on May 22, 2020. (ECF No. 1.) The parties filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 12, 14.)

### B.  Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions

of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

even if the reviewing court would decide the matter differently and even if substantial

evidence also supports the opposite conclusion." *Id*. at 286. (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*,

475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result
> in death or which has lasted or can be expected to last for a continuous period
> of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is

determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing
> substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically determinable physical
> or mental impairment that meets the duration requirement . . . or a
> combination of impairments that is severe and meets the duration
> requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your
> impairment(s). If you have an impairment(s) that meets or equals one of our
> listings in appendix 1 of this subpart and meets the duration requirement, we
> will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional
> capacity and your past relevant work. If you can still do your past relevant
> work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual
> functional capacity and your age, education, and work experience to see if
> you can make an adjustment to other work. If you can make an adjustment

to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or] her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 10, PageID.66.) At step one, the ALJ found Plaintiff met the insured status requirements through March 31, 2023 and had not engaged in substantial gainful activity since the alleged onset date of September 28, 2017. (*Id.* at PageID.57.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: multiple sclerosis;

peripheral neuropathy; diabetes; and depression. (*Id.*) These impairments did not meet or medically equal a listed impairment at step three. (*Id.* at PageID.58.) Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC"):

> to perform sedentary work as defined in 20 CFR 404.1567(a) with the following additional limitations: he can occasionally balance (uneven/slippery surfaces), stoop, kneel, crouch, crawl, and climb ramps/stairs. The claimant can never climb ladders, ropes, or scaffolds. He can have no exposure to extreme heat/cold (weather and work environment), vibration/vibrating tools, unprotected heights, or moving mechanical parts. The claimant requires a sit/stand option at will at his workstation that would not take him off-task more than ten percent of the workday – essentially, jobs that can be performed whether sitting or standing. In addition, the claimant would require "low stress" work, defined as simple, routine tasks in an environmental [sic] free from fast-pace production work (such as an assembly wherein all tasks must be completed within strict timeframes) with only simple work-related decision-making and few, if any, workplace changes.

(*Id.* at PageID.61.) At step four, the ALJ found that Plaintiff was not able to perform any past relevant work. (*Id.* at PageID.65.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy, including, for example, office clerk, protective service worker, or bench assembler jobs. (*Id.* at PageID.66.) Accordingly, the ALJ concluded that Plaintiff was not disabled. (*Id.*)

## E. Administrative Record

### i.    Plaintiff's Testimony at the Administrative Hearing

Plaintiff lives in Detroit with his wife, who works outside of their home, and three children, aged thirteen, twelve, and two. (ECF No. 10, PageID.77.) When Plaintiff's wife is at work, someone comes to Plaintiff's house to help care for their two-year-old. (*Id.*) The individual who comes to help is at Plaintiff's house for seven to eight hours and helps cook,

clean, and take care of their youngest child, who is not yet potty-trained. (*Id*. at PageID.78.) Plaintiff can change the toddler's diapers and clothes "not very often" and only on "a good day." (*Id*.) The individual who comes to help Plaintiff provides "the day-to-day care" for the child "in addition to the cooking and the cleaning." (*Id*.) Plaintiff is unable to help his older children with their homework "for the most part" due to his fatigue but testified that he can sometimes if he is awake. (*Id*. at PageID.78-79.) His older children participate in sports, but he is unable to attend their games due to his fatigue. (*Id*. at PageID.79.) In terms of preparing food for himself, Plaintiff cannot cook, but "if it's made, [he] can go grab it and go back to the room and eat it." (*Id*.) He can "sometimes" warm food in the microwave. (*Id*. at PageID.79-80.) He can use the bathroom on his own but his wife helps him while he showers "because sometimes [his] left side will give in and [he] gets numb, and [he doesn't] want to fall and hit [his] head on anything." (*Id*. at PageID.80.) He has a driver's license but drives "minimally," only about five minutes at a time to his children's school. (*Id*.) His wife drove him to the hearing. (*Id*.)

When asked whether he could run household errands such as going to the pharmacy, bank, or grocery store, Plaintiff responded that he sometimes goes to pick up his prescriptions but if the line is too long, he has to go home due to his inability to stand for long periods and have his wife go for him. (*Id*. at PageID.80-81.) Although his home has stairs going into the basement which Plaintiff cannot use, Plaintiff has not made any accommodations to his home in order for him to maintain his independence. (*Id*. at PageID.81.) Plaintiff does not use any medical equipment such as a cane or shower chair but does use icepacks when his "spasms" begin. (*Id*.)

Plaintiff graduated from high school, completed some college, and received a certification in robot programming. (*Id*. at PageID.82.) The ALJ asked about Plaintiff's prior work. Plaintiff worked in the electrical department of both Lowe's and Home Depot at different times. (*Id*. at PageID.83-84.) Plaintiff testified that in these roles he worked in "sales" at both stores and was an "electrical pro" at Lowe's. (*Id*. at PageID.84.) He performed stocking every day and provided service to customers. (*Id*.) He was required to lift about 40 pounds in these roles. (*Id*.)

The ALJ asked Plaintiff to describe in his own works why he believes he is unable to work. (*Id*. at PageID.86-87.) Plaintiff testified that "the fatigue is horrible." (*Id*. at PageID.87.) He testified that his multiple sclerosis (MS) was not responding to treatment. (*Id*.) He takes a medication but as a side effect experiences "a burning sensation" throughout his body. (*Id*.) The ALJ asked how long Plaintiff could walk at one time before needing to take a break; Plaintiff testified that he could walk less than a quarter of a mile. (*Id*.) Plaintiff could sit for thirty minutes before "fatiguing out" and could stand for ten minutes. (*Id*. at PageID.88.) He could only lift a gallon of milk. (*Id*.) Plaintiff testified that he frequently drops things, such as his cell phone or his keys, because his hands become numb. (*Id*. at PageID.89.) Plaintiff was also treated for his vision—he described it as "blurry," and explained that it is "hard to read anything"; a computer screen is "just a blur" to Plaintiff. (*Id*.) He testified that his doctors gave him glasses, but they did not help. (*Id*. at PageID.90.) Plaintiff described a "bad day" as a day when he can't do anything and can't move—when asked how many "bad days" he has had in the last year, on average, Plaintiff

explained "most days I have [] bad days." (*Id.* at PageID.91.) He testified, "maybe – I would say three times out of the week." (*Id.*)

### ii. The Vocational Expert's ("VE") Testimony at the Administrative Hearing

The ALJ questioned the vocational expert (VE). (*Id.* at PageID.91-92.) At the outset, the ALJ asked whether the VE's answers would be consistent with the Dictionary of Occupational Titles (DOT), and the VE confirmed that they would. (*Id.* at PageID.92.) The VE classified Plaintiff's past work as general hardware sales clerk, DOT code 279.357-050, SVP 4, semiskilled work, light work performed in a medium capacity; and electrical pro, DOT code 274.357-034, SVP 5, skilled work, light work performed as medium. (*Id.* at PageID.93.)

The ALJ then asked the VE to consider a hypothetical individual of Plaintiff's age and education who was limited to a full range of sedentary work with the following limitations:

> No more than occasional climbing of ramps and stairs, with no climbing at all of ladders, ropes, and scaffolds, occasional balancing, meaning uneven terrain and slippery surfaces, and the same for stooping, kneeling, crouching and crawling. There would be no exposure to extreme cold or heat, and this would mean both weather extremes as well as work environment extremes, vibration and vibrating tools, unprotected heights and moving mechanical parts. This individual would require a sit/stand option at will that would not take him off task more than 10% of the workday, so essentially jobs that could be performed either seated or standing. And, the individual would then require low-stress work, which is defined as simple, routine tasks in an environment free from fast paced production such as assembly line work where all tasks are completed within strict timeframes. There would be only simple work-related decision making and few if any workplace changes.

(*Id*. at PageID.93-94.) The ALJ asked whether such an individual could perform Plaintiff's past work, and the VE testified "no." (*Id*. at PageID.94.) The VE testified that there would be other jobs available in the national economy, though; for example, office clerk, DOT code 209.587-010, SVP 2, 50,000 jobs; protective service worker, DOT code 379.367-010, SVP 2, 9,000 jobs; or bench assembly positions, DOT code 713.687-018, SVP 2, 25,000 jobs. (*Id*.)

The ALJ asked the VE to consider an individual who had the aforementioned limitations, but in addition, could only work a sedentary position. (*Id*.) The VE responded "yes"; such jobs included office clerk, DOT code 205.367-014, SVP 2, 50,000 jobs; information clerk, DOT code 237.367-014, SVP 2, 60,000 jobs; and bookkeeping, accounting, and auditing clerk, DOT code 205.367-014, SVP 2, 30,000 jobs. (*Id*. at PageID.114.)

The ALJ asked about the same individual as before, but who also had the following additional limitations:

> the individual would be absent one or more unscheduled full or partial days a week, or if the individual were to be unable to sustain full-time work, meaning on a regular basis, meaning eight hours a day, five days a week or the equivalent due to needing breaks of sufficient duration to put that individual off task at least 25% of the workday – such breaks would be in addition to the usual workday breaks of 15 minutes in the morning and afternoon and 30 minutes at lunch and would be necessitated by any number of things, to include but not be limited to the management of physical pain, symptoms, medication side effects, to attend required treatment, to manage fatigue, et cetera[.]

(*Id*. at PageID.94-95.) The ALJ asked if such an individual could perform any of Plaintiff's past work, or any other competitive work in the national economy. (*Id*. at PageID.95.) The

VE responded, "no." (*Id.*) The ALJ asked what the "usual tolerance" was that an employer would allow for time off task and absence from work, and the VE responded that an employer would allow a maximum of one unexcused absence per month and 15% of the day off task maximum. (*Id.*) The VE clarified that her testimony was consistent with the DOT except on topics such as time off task, absenteeism, production pace, and sit/stand options, which were based on her education and professional experience. (*Id.*)

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)   Licensed physician (medical or osteopathic doctor);

(2)   Licensed Psychologist, which includes:

    (i)   A licensed or certified psychologist at the independent practice level; or

    (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)   Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)   Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices

permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)     Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social

welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.*, § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*, § 404.1520c(c)(3). This factor will include the analysis of:

(i)     Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)     Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.*, § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also

consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2). As such,

the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.*, § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical

issue, vocational issue, or the ultimate issue about whether you are disabled;" and

"[s]tatements on issues reserved to the Commissioner[;]" these statements include:

    (i)    Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

    (ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

    (iii)    Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

    (iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

    (v)    Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

    (vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.*, § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.*, § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*, § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.*, § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.*, § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an

18

important indicator of the intensity and persistence of your symptoms." *Id.*, § 404.1529(c)(3).

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account…We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)      [D]aily activities;

(ii)     The location, duration, frequency, and intensity of . . . pain;

(iii)    Precipitating and aggravating factors;

(iv)     The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)      Treatment, other than medication, . . . received for relief of . . . pain;

(vi)     Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.*, § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*,

§ 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)   The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)   The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)   Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)   The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)   The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

### G. Arguments and Analysis

Plaintiff argues that the ALJ failed to create an accurate RFC that was supported by substantial evidence. (ECF No. 12, PageID.432.)

In her written decision, the ALJ found that Plaintiff had the following severe impairments: multiple sclerosis; peripheral neuropathy; diabetes; and depression. (ECF No. 10, PageID.60), and had the RFC

to perform sedentary work as defined in 20 CFR 404.1567(a) except that the claimant can occasionally climb ramps and stairs; never with the following additional limitations: he can occasionally balance (uneven/slippery surfaces), stoop, kneel, crouch, crawl, and climb ramps/stairs. The claimant can never climb ladders, ropes, or scaffolds. He can have no exposure to extreme heat/cold (weather and work environment), vibration/vibrating tools, unprotected heights, or moving mechanical parts. The claimant requires a sit/stand option at will at his workstation that would not take him off-task more than ten percent of the workday – essentially, jobs that can be

performed wither sitting or standing. In addition, the claimant would require "low stress" work, defined as simple, routine tasks in an environmental [sic] free from fast-pace production work (such as an assembly wherein all tasks must be completed within strict timeframes) with only simple work-related decision-making and few, if any, workplace changes.

(*Id*. at PageID.61.) In reaching this conclusion, the ALJ concluded that Plaintiff had the RFC to perform sedentary work and included several postural limitations. (*Id*. at PageID.61.)

My review of the medical record includes the following objective medical evidence: an emergency room record dated September 28, 2017 provided, under "physical exam," that Plaintiff's neurological state was "grossly intact, decrease[d] sensation over the upper lip, maximillary sinus and left hand, no focal motor deficits noted. Able to perform finger nose finder and heel to shin. No pronator drift." (ECF No. 10, PageID.258-59.) Another emergency room visit record, from the same date, notes that Plaintiff's reason for the visit was facial numbness, (*id*. at PageID.261), and upon physical examination, the record notes his neurological state presented "no obvious defects" and the other elements of the physical examination were also generally normal. (*Id*. at PageID.266.) Then, a progress note from September 30, 2017, from the same hospital, provided "MRI brain w/wo contrast is concerning for demyelinating disease (lesions in periventricular white matter and corpus collosum with enhancing post-gad lesion)," (*Id*. at PageID.269.) However, the objective physical examination notes were generally normal, again. (*Id*. at PageID.270.) A progress note signed September 29, 2017 reports an MRI showed "findings suggestive of an active site of demyelination" (*id*. at PageID.274) and, although it noted the demyelinating disease was "likely multiple sclerosis [MS]", reported "objective neurological exams

21

unremarkable." (*Id*. at PageID.272.) A report dated October 11, 2017 provides that Plaintiff "completed 3 days of IV Solu-Medrol [and he] was clinically much improved." (*Id*. at PageID.329.) The same report notes that Plaintiff's facial numbness was "97% better" and Plaintiff stated his balance was off, had no dizziness, felt mildly weak, and had fatigue. (*Id*.) A report from Martin I. Belkin, D.O. on February 28, 2018 noted that Plaintiff was prescribed Adderall for his fatigue. (*Id*. at PageID.325.) A report from Robert Aquino, D.O. dated May 11, 2018 notes that Plaintiff's MS was "the same as previous" from a visit on February 14, 2018, although his chronic fatigue was worsening. (*Id*. at PageID.314.) A follow-up with Dr. Belkin on May 1, 2018 noted that Plaintiff's Adderall prescription was increased, and the doctor noted "I will have a low threshold for escalating therapy." (*Id*. at PageID.327.) Another progress note from Dr. Belkin on May 1, 2018 reported that "'he has good and bad days," "[h]e will notice that he occasionally drops objects with his left hand," and "he feels his right hand is getting more numb"; the report also states that "Adderall helps his fatigue. He does feel mentally more sharp. He states when it wears off, his legs feel weaker." (*Id*. at PageID.352.) This report noted "[h]e continues to have symptoms including weakness and numbness of his extremities. His exam does remain stable." (*Id*. at PageID.355.) Dr. Belkin provided an opinion dated November 28, 2018, stating that "[h]e has persistent symptoms including cognitive dysfunction, extreme fatigue along with muscle weakness and some muscle pain. In my opinion he is not capable of working in any capacity, including a full-time sedentary position." (*Id*. at PageID.362.)

In his argument that the ALJ failed to craft an accurate RFC, Plaintiff argues that the ALJ placed too much weight on the opinions of Drs. Rudolph, Leno, and Flake, and

not enough weight given to Dr. Belkin. (ECF No. 12, PageID.434-36.) Plaintiff emphasizes that Dr. Belkin was the only doctor to personally examine Plaintiff over numerous visits. (*Id*. at PageID.437.) Plaintiff takes issue with the ALJ's statement that Plaintiff could engage in "relatively normal daily activities." (*Id*. at PageID.449, citing ECF No. 10, PageID.65.)

The ALJ admitted that Plaintiff's physical examinations and treatment notes "described symptoms such as chronic fatigue, extremity numbness/weakness, and mild gait disturbance, which, in combination with ongoing multiple sclerosis flares, supports limiting the claimant to sedentary work with additional postural limitations." (ECF No. 10, PageID.63.) The ALJ elaborated,

> Given evidence of extremity numbness/weakness and fatigue, the undersigned included an at-will sit/stand option to allow the claimant to change positions when needed. Further, to further account for fatigue and weakness, the undersigned included a limitation that the claimant have no exposure to unprotected heights or moving machinery, as working at/around such activities could prove dangerous given these symptoms. The undersigned included other environmental limitations as well, including avoiding extreme temperatures, as the evidence noted that heat is bothersome, as well as avoiding vibration/vibrating tools.

(*Id*.) The ALJ relied on several parts of the medical record in support of this conclusion, citing records that noted Plaintiff's "physical and neurological examinations in the record were generally unremarkable overall," (*id*. at PageID.62), which comports with my own reading of the medical record. The ALJ noted that these normal findings included "5/5 motor strength, 5/5 grip strength, intact sensation, normal muscle tone, and full extremity range of motion." (*Id*.) The ALJ acknowledged that Plaintiff complained of numbness and tingling, but denied other symptoms "including muscle pain, gait

disturbance, joint pain, stiffness, arthralgia, dizziness, ataxia, and falls." (*Id.*) And the ALJ

noted the record evidence indicating that Adderall improved Plaintiff's fatigue. (*Id.*)

I suggest that the ALJ did not err in creating Plaintiff's RFC and did not craft an

inaccurate RFC based on the medical evidence. As described above, the medical evidence

in many instances notes generally normal neurological findings and indeed notes

improvement of Plaintiff's fatigue with treatment. Thus, I recommend that the ALJ's RFC

determination is supported by substantial evidence.

To the extent that Plaintiff takes issue with the ALJ's consideration of the various

medical professionals' opinions, and specifically that the ALJ did not properly consider

Dr. Belkin's opinion, I suggest that this argument also fails. At the outset, Dr. Belkin wrote

in his opinion that Plaintiff is "not capable of working in any capacity, including a full-

time sedentary position" (*id.* at PageID.362), and the ALJ was correct in writing that "the

issue of whether one is capable of working in an issue reserved for the Commissioner." (*Id.*

at PageID.64.) The ALJ also found that Dr. Belkin's opinion was non-persuasive because

it was not consistent with the record, which showed that although Plaintiff experienced

fatigue and weakness, still had generally normal muscle tone, range of motion, and

standing abilities, and thus "fails to support a finding that the claimant is incapable of

working in any capacity, even in a sedentary position." (*Id.* at PageID.64.)

While Plaintiff argues that the ALJ erred in her consideration of Dr. Belkin's

opinion, it is true that the SSA "will not defer or give any specific evidentiary weight,

including controlling weight, to any medical opinion(s) or prior administrative medical

findings, including those from your medical sources[,]" § 404.1520c(a), and "[t]he most

important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id*. "Supportability" considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" § 404.1520c(c)(1). It appears that the ALJ did take note of Plaintiff's complaints of fatigue, but ultimately found that the medical evidence did not support the claims made by Dr. Belkin, even considering his relationship with Plaintiff. In contrast with Dr. Belkin's opinion, Dr. Flake opined that Plaintiff could perform work with exertional limitations, (ECF No. 10, PageID.104-105), and Dr. Leno also suggested that Plaintiff's impairments would not render him unable to perform simple, routine tasks. (ECF No. 10, PageID.102). I note that, although the ALJ chose not to rely on Dr. Belkin's opinion, a progress note from Dr. Belkin indeed states that even considering Plaintiff's symptoms, his "exam remains stable." (ECF No. 10, PageID.355.) These opinions, in addition to medical evidence that showed Plaintiff had consistently normal neurological exams and improved symptoms with treatment, support the ALJ's decision to limit the consideration given to Dr. Belkin's opinion.

Finally, Plaintiff argues that the ALJ erred in her analysis of Plaintiff's mental impairments, arguing that "[t]he ALJ's 'Paragraph B' analysis is not supported by substantial evidence as the record demonstrates Plaintiff's MS causes him to experience more than mere 'moderate' limitations in the areas of: concentration, persistence, and

maintain pace; understanding, remembering, or applying information; and adapting or managing himself." (ECF No. 12, PageID.435.) The ALJ found that Plaintiff had moderate limitations in understanding, remembering, or applying information, mild limitations in interacting with others, moderate limitations in concentrating, persisting, or maintain pace, and moderate limitations in adapting or managing oneself. (ECF No. 10, PageID.58-60.) The ALJ relied heavily on the opinions of Drs. Leno and Rudolph, and noted the following findings: mental status and neurological examinations throughout the record that noted intact memory, reports of Plaintiff being polite and cooperative, records of normal attention and concentration abilities, and evidence that Plaintiff handles hygiene and routine well—the ALJ pointed out that, in his Function Report, Plaintiff wrote that he generally handles changes in routine well. (ECF No. 10, PageID.61.) Although Plaintiff takes issue with these findings and argues that they go against Plaintiff's hearing testimony and Dr. Belkin's opinion, the ALJ indeed considered all of the evidence in the record and is not required to give any special deference to Plaintiff's doctor or his own testimony. The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." § 404.1520c(a). While there was differing evidence between some of the opinions, the ALJ properly articulated that she found Dr. Leno's opinion to be persuasive based on its consistency wit and support by the overall record. (ECF No. 10, PageID.64.)

As for my own review of the record, the medical evidence revealed consistently normal neurological examinations, intact memory, and normal attention and concentration skills. (ECF No. 10, PageID.270 ("Attention: attention is normal, concentration is

normal")); (*Id*. at PageID.273 (same findings)); (*Id*. at PageID.331 (same findings, notably signed by Dr. Belkin)). The ALJ is not required to address every piece of evidence in the record, *Bailey v. Comm'r of Soc. Sec.*, 413 F. App'x 853, 855 (6th Cir. 2011) (quoting 20 C.F.R. § 404.953) ("But [the ALJ] is not required to analyze the relevance of each piece of evidence individually"), and I suggest that substantial evidence in the medical record supports the ALJ regarding this issue.

Second, Plaintiff argues that the ALJ's evaluation of Plaintiff's subjective complaints was not supported by substantial evidence. (ECF No. 12, PageID.442-43.) Plaintiff argues, specifically, that the ALJ improperly evaluated the intensity, persistence, and limiting effects of Plaintiff's physical and mental symptoms. (*Id*. at PageID.444.) Plaintiff alleges that the ALJ's limitations provided for Plaintiff's fatigue and weakness "do not sufficiently account for the Plaintiff's true picture of limitations caused by his fatigue and weakness which he experiences despite not being around any of these factors [listed in the RFC]." (*Id*. at PageID.445.) Plaintiff claims that the ALJ failed to include any vision-related limitations and that the ALJ erred in finding medication helped his symptoms, because Plaintiff only used Solu-Medrol in the hospital, and because he is still trying to find the right dosage of Adderall. (*Id*. at PageID.446-47.)

It is true that Plaintiff testified to his fatigue and that it made him want to sleep all day, and he also testified that looking at computer screens was difficult for him due to his vision, which apparently was not alleviated with the use of glasses. (ECF No. 10, PageID.78-79; 89-90.) The ALJ considered Plaintiff's testimony of fatigue and weakness-in her written decision; she considered the opinion of Dr. Flake, who recommended that

Plaintiff could perform work with certain limitations. (ECF No. 10, PageID.64.) But the ALJ went a step further, writing: "[w]hile the undersigned agrees that the claimant's symptoms – including fatigue, extremity weakness, and numbness – supports these postural and environmental limitations, evidence received at the hearing level including additional treatment notes and the claimant's testimony, shows that he is more limited that determined at the state level and supports limiting him to sedentary work." (*Id.*) Here, the ALJ specifically points to Plaintiff's subjective complaints and crafts an RFC that is more limited than that recommend by a state agency medical consultant. The ALJ further makes note of Plaintiff's subjective complaints throughout the opinion, referring to his description of numbness, weakness, and fatigue, but ultimately contrasts the extent of those complaints with the objective medical evidence. (ECF No. 10, PageID.62.) I suggest that Plaintiff's argument on this point fails.

Regarding Plaintiff's allegation that the ALJ failed to consider his vision difficulties, I suggest that this argument also fails. Plaintiff testified to this difficulty at the hearing, stating that it is "hard to read anything" and that a computer screen is "just a blur" to Plaintiff, (ECF No. 10, PageID.89), and testified that his doctors gave him glasses, but they did not help. (*Id.* at PageID.90.) In a medical treatment note, Plaintiff also complained of blurred vision in his left eye, and Dr. Belkin noted that it may have related to his MS. (ECF No. 10, PageID.365.) However, objective medical evidence in record notes that Plaintiff's optic nerve and cranial nerves revealed: "vision intact bilaterally, visual fields are full to confrontation, . . . no afferent pupillary defect." (ECF No. 10, PageID.273.) Another medical note listed Plaintiff's eyes, during a physical exam, as normal and "clear."

(*Id.* at PageID.318.) As Defendant argues, "[t]he ALJ is not required to specifically mention Plaintiff's own testimony concerning blurred vision." (ECF No. 14, PageID.478) (citing *Bailey v. Comm'r of Soc. Sec.*, 413 F. App'x 853, 855 (6th Cir. 2011) (quoting 20 C.F.R. § 404.953) ("But [the ALJ] is not required to analyze the relevance of each piece of evidence individually.")). Therefore, I suggest that this argument also fails.

The SSA has clarified, "statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." § 404.1529(a).

Finally, I must reiterate that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). I suggest that the ALJ properly considered the various factors required to analyze Plaintiff's subjective

complaints and, in conjunction with the available medical evidence, did not err in her analysis and conclusion regarding Plaintiff's subjective complaints.

### H. Conclusion

For these reasons, I suggest that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's motion, (ECF No. 12), and **GRANTING** Defendant's motion, (ECF No. 14), and affirming the decision.

### III.    REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which

it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: May 3, 2021                                    S/ PATRICIA T. MORRIS
                                                     Patricia T. Morris
                                                     United States Magistrate Judge